**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KEVIN M. GREGG,**

        **Plaintiff,**

                               **Case Nos.**       **2:02-cv-980**

   **v.**                                             **2:02-cv-1232**

                                             **2:03-cv-636**

                                 **JUDGE GREGORY L. FROST**

                                 **Magistrate Judge Terence P. Kemp**

**SBC/AMERITECH, et al.,**

        **Defendants.**

**<u>OPINION AND ORDER</u>**

The captioned consolidated cases are before the Court for consideration of motions for summary judgment filed by Plaintiff (Doc. # 249) and by Defendants (Doc. # 251), as well as motions to strike filed by Plaintiff (Docs. # 260 (original), 267 (corrected version)) and by Defendants (Doc. # 269).[1]  For the reasons that follow, the Court **DENIES** Plaintiff's motions (Docs. # 249, 260 & 267), **DENIES** Defendants' motion to strike as moot (Doc. # 269), and **GRANTS** Defendants' motion (Doc. # 251).

## I.  Background

At the outset, the Court must note that Plaintiff's *pro se* filings continue to present generally incoherent, often unfathomable content.  Accordingly, the Court has again endeavored to give Plaintiff the benefit of the doubt in construing his claims and in interpreting his arguments.  To that end, the Court recognizes that the following account of the facts and claims

---

[1]  For ease of reference, all citations to the record are to document numbers in case No. 2:02-cv-980 unless otherwise specified.

errs, if in error in any respect, in Plaintiff's favor by often drawing upon the allegations of his pleading. Although the pleading is essentially a morass of allegations that lack evidentiary support, the final amended pleading does provide some meager structure to the varied allegations involved in this case.

Plaintiff, Kevin M. Gregg, is an African-American male who began working for Defendant SBC on June 26, 2000. As a technician, Gregg made service calls on behalf of SBC. His tenure of service is marked by much discontent on both sides of the employment relationship.

Gregg asserts a litany of alleged unfair treatment he received during the course of his employment. For example, Gregg claims that SBC denied him the use of a new work van despite the fact that his crew had voted to distribute four new vehicles by seniority and he was one of the four most senior employees at the time. The evidence reveals that Gregg was on medical leave at the time the new vehicles were distributed and that because his manager, Defendant Joel Hall, did not know whether Gregg would ever return to work, the most senior employees currently working received the new vehicles.

Gregg also claims that he routinely received more difficult jobs that took longer to complete, which resulted in an appearance of his being less productive than other technicians. There is no evidence to support this conclusory assertion, but there is evidence in the record that managers would often have to reassign jobs previously assigned by a scheduler who lacked knowledge that a specific technician did not have had the necessary equipment in his or her work van to complete the job.

A third allegation of unfair treatment is Gregg's claim that he was asked not to sign up

for overtime work.  Gregg points to an incident in which a manager, Defendant Joel Hall, communicated via a June 24, 2001 note that Gregg should not sign up for weekend overtime work.  Gregg agrees that he ignored this directive, that he worked overtime, and that he received overtime pay for this work without consequent discipline.  The evidence indicates that managers can assign only a limited amount of overtime and that a no-show means that the company misses a service appointment with a customer.  Thus, Hall asserts, he wrote the note because Gregg had previously signed up for overtime work but that he had not shown up to work the shift.  The evidence also indicates that Hall had also previously told a Caucasian technician not to sign up for overtime for the same reason.

Gregg further points to discipline he received for attendance issues as additional examples of unfair treatment.  The attendance problems take two forms.  First, Hall gave Gregg a written warning that he could lose his job for additional absences when Gregg returned from a two-month disability leave in October 2001.  SBC's attendance policy was that employees receive a written warning if they take two disability leaves within their first year of employment.  Hall concedes that he was incorrect in issuing the written notice because one of Gregg's two extended absences was approved Family and Medical Leave Act leave, which Hall did not know was exempt by the written-warning policy.  This error was remedied through the grievance process by the removal of the written warning from Gregg's file and his receiving a coaching and counseling session for the one disability leave that counted under the policy.  Second, Gregg asserts that he was disciplined for being tardy when he was in fact taking unscheduled vacation time.  SBC policy requires employees who seek to take unscheduled vacation must provide notification prior to the start of his or her work shift.  But instead of providing such notice to

3

Keenan, his manager, Gregg called a manager for whom he did not work.  This issue was also addressed through a grievance process and resulted in Gregg receiving another coaching and counseling session.

Gregg complains that Defendants also treated him unfairly by disciplining him for going home for lunch.  SBC policy forbids such action unless a technician is within his or her home area on a service call or unless that individual has received specific permission to do so.  Gregg claims that he was singled out for partaking in the common practice of violating the policy, but he cannot point to any individual who went home without permission and was not disciplined.

Gregg also raises the allegation that Defendants repeatedly investigated him in an attempt to uncover wrongdoing to justify termination attempts.  He first points to an investigation of an April 2001 incident in which Gregg alleges he injured his arm while at work.  Defendants note that this investigation occurred because they were concerned about disability fraud, due to the fact that Gregg told one manager that he had hurt his arm while drilling into a brick wall, while telling another manager that he was injured when a ladder he was carrying blew out of his hand. Defendants also investigated Gregg following his January 2002 admission that he had used cross-cut boxes to make personal long-distance calls, because cross-cut calls are charged to the customer to whom a telephone line belongs.  Finally, Defendants investigated Gregg after a customer reported that he had broken into a customer's locked facility by using either a screwdriver or a knife.  Gregg admitted this conduct to SBC in a signed statement.

Additionally, Gregg asserts that his co-workers harassed him on account of his race, although he concedes that he never reported the alleged harassment to anyone.  He claims that a fellow employee–who Gregg calls "Mr. Clean" because he does not know the man's

name–threatened to "kick [his] black ass" if Gregg did not vacate a chair in which the man usually sat in an area of the SBC garage.  This same man purportedly called Gregg a "mother fucker."  Gregg cannot recall with specificity any other allegedly race-related remarks.  He does, however, assert that his coworkers routinely took tools from his SBC work van, although he concedes that the tools reappeared after each disappearance.

In addition to allegedly racially hostile coworkers, Gregg contends that he also faced racially hostile supervisors.  Gregg asserts that he heard that Keenan and Hall are prejudiced, but concedes that he never overheard a racial remark by either man.  Gregg also complains that Keenan did not let him tape record a meeting they had.  Similar to his allegations of hostile co-workers, Gregg also never reported any incidents of supervisor-harassment based on race.

Gregg further asserts that Defendants retaliated against him for filing charges with the Equal Employment Opportunity Commission ("EEOC").  The factual predicate for this claim, like many of the claims involved in this action, is confusing.  It appears that Gregg filed three EEOC charges dated, respectively, January 22, 2002, September 25, 2002, and February 10, 2004.  He asserts that Defendants retaliated against him for complaining about disparate treatment.

There is also an allegation that SBC violated Gregg's right to overtime pay.  The first incident revolves around 6.5 hours that Gregg worked on Saturday, October 20, 2001.  The prior day, Hall had reportedly instructed his crew members that they were not to work overtime that coming.  Gregg nonetheless reported for overtime duty and performed several jobs.  Hall subsequently deleted the hours from Gregg's time sheet and Gregg did not receive overtime pay.

The second overtime pay incident occurred on January 11, 2002.  In reviewing employee

work records, Keenan (who was by now Gregg's manager) noted that Gregg had claimed .5 hours overtime more than another employee who had worked on a project and who did not claim the time. Because Gregg's GPS records indicated that he had arrived at the same time as the other employee, Keenan removed the .5 hours from Gregg's time sheet, and Gregg did not receive overtime compensation for this time. Gregg filed a grievance over the matter, and, citing the fact that the company required managers not to rely on the GPS records but to observe the alleged misconduct, SBC paid Gregg overtime compensation.

Gregg suggests that two other incidents occurred in which he did not receive overtime compensation for completed work. Because he is unable to provide details regarding these incidents, the Court only mentions them here and will discuss them more fully later in this decision.

Issues also arose surrounding Gregg's use of his company cellular phone. Gregg concedes that during the period of October 24, 2001 through November 19, 2001, he used the company cellular phone assigned to him to place 190 long distance phone calls that totaled over 10 hours. Gregg also concedes that he had obtained permission to place one call, but not 190 such calls. Despite lacking permission, Gregg made several such unauthorized calls, inexplicably while being accompanied in the field by then-SBC training and development manager Richard Wakefield. Gregg had submitted time cards for this time, for which he was paid.

Wakefield informed Gregg's manager, Defendant Tom Keenan, that he had observed Gregg making unauthorized long distance calls. Keenan therefore reviewed Gregg's cellular telephone records and discovered the calls. Keenan stopped counting the number of calls after

6

reaching 89, despite the fact that numerous other impermissible calls appeared on the records.

Accordingly, after consulting with SBC's human resources department concerning comparable

infractions and the punishment administered, Keenan suspended Gregg for 10 days on December

13, 2001 for violating SBC's Code of Business Conduct and Technician's Expectations, both of

which expressly prohibited using company phones for such activity.  Gregg received at the time

of his suspension a written warning indicating that any further such violations would lead to his

dismissal.  He ties his suspension to discrimination and retaliation.

Toward the end of December 2001, Gregg reported this written warning to the human

resources department and indicated that he felt his job was in jeopardy.  He had previously

contacted that department with allegations that his superiors were falsifying his company records

and making false statements against him for months.  In various reports to human resources,

Gregg set out a litany of complaints centering around his using the company vehicle for

prohibited personal errands during lunch, his attendance issues, and other perceived

mistreatment.  In all, it appears that Gregg spoke with human resources at least nine times in less

than a month, sometimes three to four times a day.  Records of these reports at times contain

conflicting details, such as a report that a manager Joyner had misinformed him of the date he

was to return from his suspension; by the next month, Gregg had faxed human resources that

Keenan had in fact told him on what date to return.

Three events of note occurred during the period of Gregg's suspension.  First, several

days after the suspension commenced, Keenan then reviewed the cellular telephone records of

seven of Gregg's fellow employees and found that only two individuals had made long distance

personal calls for a combined total of fourteen minutes.  When subsequent notable infractions of

7

company policy occurred, Defendants disciplined the employees involved commensurate with the severity of the abuse uncovered.

Second, while on suspension, Gregg asserts that tendonitis in his elbow from a previous work injury reoccurred.  He avers that Keenan acted to delay his receiving workers' compensation for the reoccurrence, but the evidence indicates that a delay in his receiving medication was tied to unpaid bills with which Keenan was not involved.  Gregg further asserts that Keenan improperly required him to call work each day while off on disability, but the evidence indicates that once Gregg had been released for light duty work, Keenan asked him to call each day to see whether light duty work was in fact available.

Third, Gregg returned from his suspension late after Keenan, not Joyner, miscounted and told him to return on the wrong date.  The evidence does not indicate how this harmed Gregg, although he asserts that it was part of an apparently never-executed plan to charge him with an attendance violation warranting discipline.

Gregg returned to work in January 2002 and applied for a promotion to lead technician. He did not receive this promotion because Keenan linked a technician's productivity to his or her qualifications, and Gregg was lower than all other six lead technician applicants.  At the end of that month, Keenan reviewed Gregg's cellular phone records for the month to ensure that Gregg was not repeating his misconduct.  Keenan discovered that Gregg continued to make unauthorized personal calls, using his company cellular phone to make 118 local calls totaling over 10 hours.  Gregg had again submitted time cards for this activity and collected pay for these hours.

Keenan therefore suspended Gregg pending dismissal on February 8, 2002.  Gregg was

8

then formally discharged on February 28, 2002.  He subsequently filed case No. 2:02-cv-980 on

October 3, 2002.  (Doc. # 3.)  Gregg also filed a case in state court against Defendants that was

removed to this Court in December 2002 and assigned case No. 2:02-cv-1232.

A third case also arose.  Following his termination, Gregg filed a grievance pursuant to

the collective bargaining agreement between SBC and the Communication Workers of America,

Local 4320, the union that represented Gregg.  Gregg asserted that his termination was based on

his race and not just cause.

In April 2003, this grievance came on for a "neutral evaluation," which, pursuant to

procedures set forth in a collective bargaining agreement appendix, meant that a neutral

evaluator considered the grievance and issued an advisory opinion.  In addition to recommending

that the 10-day suspension be upheld, the neutral evaluator concluded that SBC lacked just cause

to terminate Gregg and recommended the remedy of reinstatement with reinstated benefits and

six months back pay set off by Gregg's interim earnings and unemployment benefits.  Gregg

alleges that SBC agreed to accept the advisory opinion on the date of the neutral evaluation.

Under the neutral evaluation procedures, Gregg's grievance would proceed to regular

arbitration if either SBC or the union rejected the advisory opinion by notifying the other in

writing within two working days of the neutral evaluation.  The evidence indicates that SBC and

the union had agreed to permit oral repudiation and that SBC Vice President Ronald Wells

apparently orally repudiated the advisory opinion in a phone call to the union within the two-day

period.  On May 15, 2003–more than two days after the neutral evaluation and after Gregg

claims that SBC accepted the advisory opinion–SBC faxed Gregg an "Agreement and Release of

All Claims" that provided for reinstatement with six-months back pay and restoration of all

benefits as recommended by the neutral evaluator.  This agreement also provided for the dismissal with prejudice of all of Gregg's claims against SBC and included the withdrawal of one of the EEOC complaints that Gregg had filed.   Gregg declined to sign the agreement, and the union subsequently declined to pursue his cause in arbitration because it disagreed with Gregg that SBC had agreed to accept the advisory opinion and that it had breached the collective bargaining agreement.  Further, Gregg refused to sign off on the union's version of the neutral evaluation.

Gregg sought to confirm and enforce the advisory opinion by filing a second state court suit in the Franklin County Court of Common Pleas in June 2003.  (Doc. # 1, Ex. A, Complaint.) Defendants also removed this second state court action to this Court on July 16, 2003; that case constitutes case No. 2:03-cv-636.  All three cases were subsequently consolidated before the undersigned judge.  (Doc. # 8 in 2:03-cv-636.)

Following numerous, numerous delays that need not be recounted here, Gregg filed his comprehensive final amended complaint (with previously omitted attachments) on September 24, 2004.  (Doc. # 221.)  The complaint names five defendants: SBC, Tom Keenan (Gregg's last manager), Joel Hall (Gregg's previous manager in 2001), Mike Hay (SBC area manger), and Dan Wiley (SBC director).  This pleading asserted causes of action against Defendants for race discrimination, harassment, retaliation, violation of Section 301 of the Labor Management Relations Act, violation of the FLSA, and for the intentional infliction of emotional distress. Both sides have filed motions for summary judgment (Docs. # 249, 251) and motions to strike (Docs. # 260 & 267, 269).  All four motions are now ripe for disposition.

## II.  Motions to Strike

As part of both his original and corrected memorandum in opposition to Defendants'

motion for summary judgment,  Gregg makes the following motion:

> Potions [*sic*] of Defendants [*sic*] Summary Judgment motion referenced affidavits
> or documents which had not been provided to Plaintiff prior, or are believed to be
> improperly presented and that this evidence should be stricken or allow plaintiff
> to amend his claim for the tampering of evidence, which prevented the challenge
> and request for evidence and interrogatories surrounding these individuals [*sic*]
> alleged knowledge of said claims, thus my claims are prejudiced as will be
> reflected.

(Docs. # 260 & 267, at 1.)  Several problems exist with this request.

First, the "motion" does not comply with S.D. Ohio Civ. R. 7.2(a)(1) in that it offers no

supporting authority.  Second, Gregg's unspecific request renders it virtually impossible for this

Court to identify all the offending affidavits or documents he presumably targets.  Third, to the

extent that Gregg again seeks to place into contention his allegations of spoliation of evidence,

this Court has previously rejected consideration of that potential claim.  Fourth, even if the Court

were to consider Gregg's spoliation theory for the limited purpose of his motion to strike, there

is no apparent basis for his allegations that Defendants have altered and/or withheld relevant

documents.

Part of Gregg's confusion in regard to the summary judgment proceedings appears to

stem from his misunderstanding of what evidence is discoverable, such as the affidavit from

SBC human resources representative Diana Bottalla or the affidavit of SBC senior labor relations

manager Bryan Redfern.  But a lack of understanding does not permit a party, even a *pros se*

plaintiff, to strike unfavorable summary judgment evidence from the record.  Confusion may

also arise from the fact that Defendants cite in their dispositive motion memoranda to material

not included in their two-volume collection of exhibits, such as an affidavit from SBC Vice

11

President Wells, which they filed separately on January 25, 2005.  (Doc. # 254.)

The Court **DENIES** Gregg's motion to strike.  (Docs. # 260 & 267.)

Also before the Court is a motion to strike filed by Defendants as part of their reply memorandum.  (Doc. # 269.)  Defendants ask the Court to strike all of the exhibits that Gregg has attached to his memorandum in opposition "because none of the documents have been authenticated or certified according to the requirements of Rules 901(b)(7), 902(4) and 44(a) of that [*sic*] Federal Rules of Evidence, and thus, cannot be considered by a court when ruling on summary judgment."  (Doc. # 269, at 4.)  Defendants also contend that

> each "exhibit" appears to be nothing more than a compilation of unorganized and unrelated documents.  Plaintiff directs the court to multiple exhibits in each section or subsection of his Opposition, with no explanation of what the exhibits purports to be, or what the documents within the exhibit purport to prove. Defendants are simply at a loss as to Plaintiff's intentions with the majority of the exhibits.

(Doc. # 269, at 5.)  The Court is fully in agreement with Defendants' latter evaluation of Gregg's exhibits.  The Court also recognizes Defendants' citation to ample authority that the Court need not sift through the record in search of evidence supporting a party's contentions.  Given these two preceding points, the Court **DENIES** Defendants' motion as moot.  (Doc. # 269.)  The Court shall consider proper evidence to which it is directed in some discernable manner, which inherently means that the Court will not consider improper submissions or otherwise unnecessarily parse the record in search of any potential factual issue.  To identify, consider, and potentially strike each exhibit Gregg has submitted prior to reviewing the actual arguments and citation to the exhibits he makes would be an unnecessary exercise.

### III.  Supplemental Filing

After the Court had completed the initial draft of this decision, Gregg filed a June 20,

12

2005 document titled "PLAINTIFF'S <u>SUPPLENTAL</u> [*sic*] <u>AFFIDAVIT</u> and MEMORANDUM

IN OPPOSITION TO DEFENDANTS['] MOTION FOR SUMMARY JUDGEMENT." (Doc. #

275.) The Court has reviewed this document and finds it to be a list or outline of material

contained within the three volumes of exhibits Gregg submitted to this Court on February 11,

2005 (labeled "Volume No. 1," "Volume No. 1 - Part 2," and "Volume No. 2"). It appears that

Gregg intends for his June 20, 2005 filing and its commentary on each exhibit to support the

authenticity of the exhibits and to clarify his intent behind submitting each document.

The filing of Gregg's affidavit necessitates three comments. First, to the extent that

Gregg's latest filing constitutes summary judgment evidence or an additional memorandum, the

filing of this document clearly violates S.D. Ohio Civ. R. 7.2(e). That local rule provides that

"evidence shall be attached to the memorandum or included in an appendix thereto, and shall be

submitted within the time limit set forth above." S.D. Ohio Civ. R. 7.2(a)(2) and (e). The

"above" references S.D. Ohio Civ. R. 7.2(a)(2), which provides that "[a]ny memorandum in

opposition shall be served and filed within twenty-one (21) days from the date of service set

forth in the certificate of service attached to the Motion," with an additional three days added

pursuant to that local rule as a result of service. Notably, the local rule also prohibits "additional

memoranda beyond those enumerated ... except upon leave of court for good cause shown."

S.D. Ohio Civ. R. 7.2(a)(2). This means that a party cannot file additional supporting evidence

or memoranda beyond the filing deadline without obtaining leave of court.

Second, Gregg did not seek leave of Court before filing the June 20, 2005 document,

despite the fact that the Court has previously permitted Gregg to "correct" his filings by way of

supplementing them with material that he purportedly routinely forgets to attach to his filings.

Third, the curious timing of Gregg's latest filing, submitted just weeks before the scheduled final pretrial conference and when the parties are set to receive the Court's decision on the summary judgment motions, suggests by reasonable inference that Gregg either intends to prejudice Defendants or to delay these proceedings while Defendants seek to respond to any new allegations contained within his affidavit/outline.  Such conduct is simply not permitted.  No party can selectively ignore a court's deadlines and file out-of-rule material whenever he or she wants.  To permit any party to do so would be for this Court to endorse litigation by ambush.  It would also carve away at respect for the Court (and its deadlines) and would effectively mean that the Court has abdicated case management responsibility by elevating the parties' whims over the Federal Rules of Civil Procedure, the Local Civil Rules, and Court Orders.

The Court refuses to endorse such misconduct.  Gregg has had ample time to comply with the Court's deadlines and the rules governing this litigation.  But Gregg has again ignored his obligations, and his most recent conduct would serve only to prejudice Defendants or to again delay this case unnecessarily.  Accordingly, the Court **STRIKES** Gregg's June 20, 2005 filing.  (Doc. # 275.)

### IV.  Summary Judgment Motions

#### A.  Standard Involved

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must therefore grant a motion for summary judgment here if Gregg, the nonmoving party who has the burden of proof at trial, fails to make a

14

showing sufficient to establish the existence of an element that is essential to his case.  *See*

*Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of Gregg,

who must set forth specific facts showing that there is a genuine issue of material fact for trial.

*Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad*

*v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact

exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-

52.)

**B.  Race Discrimination**

Gregg asserts federal claims for race discrimination under Title VII and 42 U.S.C. §

1981, as well as an analogous state law claim under Ohio Rev. Code § 4112.02.  He can prove

race discrimination in two ways.  The first way is by direct evidence, and the second way is by

indirect evidence.  *See Young v. Sabbatine*, 238 F.3d 426, 2000 WL 1888672, at *4 (6th Cir.

2000) (unpublished table decision).  Gregg's theory of the case requires drawing inferences

based on indirect evidence.

The Sixth Circuit has explained that "[t]o succeed on a discrimination claim based on

indirect evidence, a plaintiff must first demonstrate a *prima facie* case of discrimination." *Koval*

*v. Dow Jones & Co.*, 86 Fed. Appx. 61, 66, 2004 WL 74651, at *4 (6th Cir. Jan. 6, 2004) (citing

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Carter v. Univ. of Toledo,* 349

F.3d 269, 272-73 (6th Cir.2003)).  To establish a *prima facie* case of race discrimination Gregg

must therefore show that "(1) [he] was a member of a protected class; (2) [he] was discharged;

(3) [he] was qualified for the position; and (4) [he] was replaced by a person outside the class."

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  The Court of Appeals has clarified

that a plaintiff can also satisfy the fourth element by showing that " 'a comparable non-protected

person was treated better' " or "that for the same or similar conduct [the plaintiff] was treated

differently than similarly-situated non-minority employees."  *Id*. at 582-83.

This same standard also governs Gregg's state law claim of race discrimination.  *See*

*Koval*, 86 Fed. Appx. at 65, 2004 WL 74651, at *4 ("Ohio courts evaluate discrimination claims

presented under § 4112 according to the same standards federal courts utilize to evaluate

discrimination claims presented under Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000e-

2000e(17)"); *Nelson v. General Elec. Co.*, 2 Fed. Appx. 425, 430, 2001 WL 69201, at *4 n.2 (6th

Cir. Jan. 17, 2001); *Mitchell*, 964 F.2d at 582.  This is because the Supreme Court of Ohio has "

'determined that federal case law interpreting Title VII of the Civil Rights Act of 1964, Section

2000e *et seq.,* Title 42, U.S.Code, is generally applicable to cases involving alleged violations of

[Ohio Rev. Code] Chapter 4112.' "  *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d

169, 729 N.E.2d 726, 731 (2000) (quoting *Plumbers & Steamfitters Joint Apprenticeship*

*Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 421 N.E.2d 128, 131 (1981)).

Defendants argue that Gregg cannot present a *prima facie* case of race discrimination

under the foregoing standard.  In making this argument, Defendants do not dispute several of the

16

prongs.  It is beyond question, for example, that Gregg satisfies the first prong of the test; as an

African-American, Gregg is a member of a protected class.  *See Oatman v. Potter*, No. 01-2363,

2004 WL 68537, at * 6 (6th Cir. Jan. 8, 2004) (slip opinion) (citing *Logan v. Denny's, Inc.*, 259

F.3d 558, 567 (6th Cir. 2001)).

It is also apparent that Gregg satisfies the second prong of the test, despite the fact that

nearly all of his allegations toward Defendants could not satisfy this prong.  It is well-settled that

"Title VII does not provide a remedy for actions that do not materially affect the terms of

employment."  *Rowser v. Alliant Foodservice, Inc.*, No. 04-2192, 2005 WL 589980, at *1 (7th

Cir. Mar. 8, 2005) (holding that a rescinded suspension with no accompanying loss in pay,

benefits, or other material harm did not provide an adverse employment action under Title VII).

The question of materiality is of substantial import, then, and the Court can find some guidance

in *White* v. *Burlington Northern & Santa Fe Railway Company*, 364 F.3d 789 (6th Cir. 2004) (en

banc).  This controlling precedent echoes the underlying *general* proposition of *Rowser*: an

employment action that is a mere inconvenience or that is of no consequence beyond a bruised

ego is insufficient to suffice as an adverse employment action.  *Id*. at 802.  Post-*White*, the Sixth

Circuit has explained:

> An adverse employment action is a "materially adverse change in the
> terms or conditions of ... employment because of [the] employer's conduct."
> *Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996).  Under this
> standard, a "materially adverse" change in employment conditions "must be more
> disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.*
> at 886 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th
> Cir.1993)).  "The Sixth Circuit has consistently held that de minimis employment
> actions are not materially adverse and, thus, not actionable."  *Bowman v. Shawnee
> State Univ.,* 220 F.3d 456, 462 (6th Cir.2000).  As this Court recently pointed out,
> a "bruised ego" is simply not enough to constitute an adverse employment action.
> *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 797 (6th Cir.2004) (en
> banc) (quoting *Kocsis,* 97 F.3d at 886).

*Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (examining material effect of actions in determining whether an adverse employment action had occurred, and specifically concluding that unimplemented actions were insufficient). Title VII thus requires an adverse employment action of *some* consequence. *See Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (suspension with pay and subsequent reinstatement is not an adverse employment action). *See also Mayers v. Campbell*, 87 Fed. Appx. 467, 470, 2003 WL 23140061, at *1 (6th Cir. Dec. 15, 2003) (employee's successful grievance resulting in rescinded suspension meant that employee had no adverse employment action, despite delay in removing documentation about the suspension from his personnel file ); *Gibbs v. General Motors Corp.*, 104 Fed. Appx. 580, 582-83, 2004 WL 1468371, at *2 (7th Cir. Jun. 28, 2004) (rejecting employee's emotional distress and embarrassment as constituting adverse employment action in case involving a rescinded suspension with no loss of pay or benefits); *Stavropoulos v. Firestone*, 361 F.3d 610, 617-18 (11th Cir. 2004) (acts that had no effect on employee's employment status, as well as incidental costs and emotional distress associated with employee challenging actions, did not constitute adverse employment action); *Haddon v. Executive Residence at White House*, 313 F.3d 1352, 1363 (Fed. Cir. 2002) (suspension without loss of pay did not constitute adverse employment action).

The Court recognizes that Defendants' reasoning is correct in asserting that Gregg did not suffer a material job consequence in connection with most of the allegations of his complaint. *See, .e.g, Virostek v. Liberty Township Police Dep't*, 14 Fed. Appx. 493, 504, 2001 WL 814933, at *6 (6th Cir. July 11, 2001) (holding that no *prima facie* case existed over

assignment of older equipment to employee); *Mitchell*, 389 F.3d at 182 ("Mere threats of alleged adverse employment action are generally not sufficient to satisfy the adverse action requirement"). His complaints run from meager disappointments (assignment of new vehicle), to incidents of no apparent import (erring in calculating his return date from suspension), to legitimate business activities (investigating Gregg for fraud and criminal misconduct), to apparently unfounded, conclusory speculation (he alleges that he was given more difficult work and was critiqued more harshly, but offers no evidence to support these conclusions). Defendants have correctly set forth in their motion dispositive case law addressing such allegations that need not be retread here. Moreover, most of his allegations simply fail to satisfy the "materially adverse" requirement even in the aggregate because they do not effectuate a significant alteration in his employment. They are simply numerous perceived slights that Gregg has pieced together in a tapestry of apparently unwarranted suspicion and perceived persecution.

Gregg's 10-day suspension and his eventual termination, however, do on their face qualify as adverse employment actions sufficient to satisfy this second prong of the inquiry. Further, SBC does not dispute the third prong of the inquiry–Gregg's qualifications–other than to assert that he did not meet the criteria for promotion. This case therefore also turns on the remaining fourth prong of what Gregg must show to establish a *prima facie* case–that he was treated differently than a non-protected, similarly situated individual. The Court agrees with Defendants that Gregg cannot meet his burden on this prong in regard to all his allegations.

In regard to his suspension specifically, the evidence indicates that Defendants disciplined individuals for improper cellular phone usage in correlation with the degree of the infraction and that no other employee presented to this Court violated SBC policy to the degree

19

of severity and frequency that Gregg did. (Keenan Aff. ¶¶ 5-21; Bottalla Aff., Ex. A.) The evidence also indicates that Gregg ignored a prior specific warning concerning abuse of the phone. This same rationale also extends to Gregg's termination for a repeated violation of company policy. Gregg has failed to present evidence that Defendants treated any similarly situated Caucasian individual better on discovering an initial infraction of commensurate severity, and he has failed to point to disparate treatment for a repeat offender with a similar disciplinary history. Further, to the extent that Gregg complains about the comparable time frame involved, he has failed to present a cogent argument as to how he was prejudiced by Defendants' decision to impose discipline for cellular phone abuse that occurred in January 2002 when he apparently benefitted from that decision and his discharge was based on his January 2002 misconduct.

Having failed to present a genuine issue of fact as to whether he can satisfy the fourth element of his race discrimination claims, Gregg cannot evade summary judgment. Further, even assuming that Gregg has in fact presented a *prima facie* case of race discrimination, his race discrimination claims still fail. The Sixth Circuit has explained that a different inquiry results once a plaintiff such as Gregg establishes a *prima facie* case:

> If a plaintiff demonstrates a *prima facie* case of either age or race discrimination, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the challenged employment actions. *McDonnell Douglas,* 411 U.S. at 802; *see also Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th Cir.2003) (en banc) (applying *McDonnell Douglas* analysis to age discrimination claim); *Zambetti v. Cuyahoga Cmty. Coll.,* 314 F.3d 249, 255-56 (6th Cir.2002) (applying *McDonnell Douglas* analysis to reverse race discrimination claim). The defendant need only produce a legitimate, non-discriminatory reason; it need not persuade the court that this reason actually motivated the employment actions in question. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Once the defendant meets its burden of producing a legitimate, non-discriminatory reason for its challenged actions, the

20

burden shifts to the plaintiff to demonstrate that the asserted justification is mere pretext for discriminatory motives.  *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 615 (6th Cir.2003).  The plaintiff may meet this burden by showing that the reason offered by the defendant for the challenged employment actions (1) has no basis in fact, (2) did not actually motivate the actions, or (3) was insufficient to warrant the actions.  *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994). The burden of persuading the trier of fact that defendant's asserted justification is pretextual ultimately rests with the plaintiff.  *Anthony v. BTR Auto. Sealing Sys., Inc.,* 339 F.3d 506, 515 (6th Cir.2003).

*Koval*, 86 Fed. Appx. at 66, 20045 WL 74651, at *4 (footnote omitted).

Here, Defendants have offered a legitimate, non-discriminatory reason for the challenged major employment actions: Gregg repeatedly violated at least one company policy, despite having been informed of that policy and specifically warned of the consequences of a repeated policy infraction.  As Defendants note, Gregg does not contest that the facts underlying his misconduct.  Instead, he appears to attack the sufficiency of the reasons underlying his suspension and subsequent discharge.  But he fails to connect the enforcement of the policy and progressive discipline to his race.  In regard to Gregg's complaints that the Court has noted lack materiality, the Court has already noted in this discussion and in setting forth the background facts earlier the numerous legitimate, non-discriminatory reasons for these challenged employment actions.  Further, Gregg's claim of a failure to promote fails because he has not demonstrated that he was qualified for the position he sought.

The honest belief rule also controls the claims involved in this case.  For example, even if Keenan's initial investigation of Gregg's co-workers failed to uncover the widespread abuse of cellular phone that Gregg asserts, it is well settled that "personnel decisions based on erroneous, incorrect or mistaken information do not give rise to a federal cause of action."  *Campbell v. Hamilton County, Ohio*, 23 Fed. Appx. 318, 325, 2001 WL 1322785, at *5 (6th Cir. Oct. 17,

2001) (citing *Bishop v. Wood*, 426 U.S. 341, 349-50 (1976)).  In other words, a mistake of the

sort Gregg asserts, even if true, nonetheless fails to present a race-based decision on the part of

Defendants so as to demonstrate pretext and enable Gregg to survive summary judgment.

   Gregg has failed to produce evidence suggesting that Defendants in general and Keenan

specifically did not honestly believe the proffered reason for both his suspension and discharge,

even if the factual assessments underlying those reasons were ultimately in error.  He has also

failed to produce evidence of pretext that Defendants did not doubt, for example, whether he

would ever return to work in deciding how to assign the new vehicles.  It is well settled that to

establish pretext, a "plaintiff must allege more than a dispute over the facts upon which his

discharge was based.  He must put forth evidence which demonstrates that the employer did not

'honestly believe' in the proffered non-discriminatory reason for its adverse employment

action."  *Braithwaite v. Timken Co.,* 258 F.3d 488, 493-94 (6th Cir. 2001) (citing *Smith*, 155

F.3d at 806-07).  The Court of Appeals has therefore set forth the essential inquiry for a court:

> In deciding whether an employer reasonably relied on the particularized
> facts then before it, we do not require that the decisional process used by the
> employer be optimal or that it left no stone unturned.  Rather, the key inquiry is
> whether the employer made a reasonably informed and considered decision
> before taking an adverse employment action.
>
> If there is no material dispute that the employer made a "reasonably
> informed and considered decision" that demonstrates an "honest belief" in the
> proffered reason for the adverse employment action, the case should be dismissed
> since no reasonable juror could find that the employer's adverse employment
> action was pretextual.

*Braithwaite*, 258 F.3d at 494 (internal citation omitted) (quoting *Smith*, 155 F.3d at 807).  Here,

despite Gregg's conclusory contrary assertions, there is no material dispute over whether

Defendants made a reasonably informed and considered decision that demonstrates an honest

belief in the proffered reasons for the treatment afforded Gregg.

There is an absence of any evidence suggesting a discriminatory animus by Defendants. Defendants are thus entitled to judgment as a matter of law on Gregg's claims of race discrimination.

### C.  Racial Harassment

To prove discrimination in the form of a hostile work environment, a plaintiff must show that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment .... Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 Fed. Appx. 678, 681, 2003 WL 682746, at *3 (6th Cir. Feb. 24, 2003) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-23 (1993)) (internal quotes and citations omitted). An employer has an affirmative defense to retaliatory harassment by a supervisor by proving "(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)).  The availability of this defense is qualified by the United States Supreme Court's admonition that "[n]o affirmative defense is available ... when the supervisor's harassment culminates in a tangible employment action, such

23

as discharge, demotion, or undesirable reassignment." *Burlington Indus.*, 524 U.S. at 765. *See also Mast v. IMCO Recycling of Ohio, Inc.*, 58 Fed. Appx. 116, 119, 2003 WL 247109, at \*2 (6th Cir. Feb. 3, 2003).

      Viewing all the evidence in a light most favorable to Gregg, the Court concludes that no reasonable factfinder could find against Defendants on the hostile work environment claim. The name-calling and single comment referencing his race that Gregg recounts simply do not constitute conduct that was severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a *reasonable person* would find hostile or abusive. Further, Defendants point to anti-racism policies designed to prevent race-related misconduct, and by conceding in his deposition testimony that he did not report any alleged racial incident to his supervisors, Gregg fails to demonstrate how he pursued relief through SBC's formal policies and procedures. With one potential exception, discussed below, there is simply no evidence that Defendants knew about improper behavior, and there is no evidence that they tolerated or condoned improper behavior. This undercuts Gregg's claim of a hostile work environment.

      The sole specific incident Hall apparently did know about–the "Mr. Clean" incident–fails to itself present a severe or pervasive pattern of harassment that objectively constitutes a hostile work environment. This one isolated event cannot be said to have altered the conditions of employment, and even crediting Gregg's other allegations, such as disappearing and reappearing tools, the Court recognizes that he has failed to connect such minor nuisances to any discriminatory animus.

      There is also no evidence of race discrimination or harassment by those who supervised Gregg. His reliance on unnamed sources who purportedly informed him that his supervisors

were prejudiced hardly suffices as presenting specific facts, much less evidence of racial animus

on the part of SBC management.  The one specific incident to which Gregg points is that Hall

was present when "Mr. Clean" allegedly made the remark about Gregg's race, but this fails to

present evidence of a discriminatory animus on the part of any supervisor.  *See Smith v. Leggett*

*Wire Co.*, 220 F.3d 752, 759-60 (6th Cir. 2000) (holding that a stray or isolated discriminatory

remark by non-manager is not indicative of supervisor's racial animus).  Nor could it permit a

reasonable juror to conclude that a hostile work environment filled with severe or pervasive

misconduct existed as a result of Hall's actions or inaction.  Gregg has simply not demonstrated

that his former employer knew or should have known of harassment and failed to take

appropriate remedial action.

Defendants are thus also entitled to summary judgment on Gregg's racial

harassment/hostile work environment claims.

### D.  Retaliation

Gregg also asserts claims of retaliation under 42 U.S.C. § 2000e-3(a) ("It shall be an

unlawful employment practice for an employer to discriminate against any of his employees ...

because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter") and potentially the analogous state

counterpart embodied in Ohio Rev. Code § 4112.02.  In order to establish a *prima facie* case of

retaliation, a plaintiff must prove that

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected
> rights was known to defendant; (3) defendant thereafter took adverse employment
> action against the plaintiff, or the plaintiff was subjected to severe or pervasive
> retaliatory harassment by a supervisor; and (4) there was a causal connection
> between the protected activity and the adverse employment action or harassment.

25

*Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted).

The Sixth Circuit has explained that the burden of establishing such a *prima facie* case is easily

met.  *Schramm v. Slater*, 105 Fed. Appx. 34, 41, 2004 WL 1595195, at *6 n.5 (6th Cir. July 14,

2004).  This same standard governs Gregg's claim under § 1981 and his state law claim under

Ohio Rev. Code § 4112.02.  *See Jeffries v. Wal-Mart Stores, Inc.*, 15 Fed. Appx. 252, 264, 2001

WL 845486, at *9 n.5 (6th Cir. July 20, 2001); *Thatcher v. Goodwill Indus. of Akron*, 117 Ohio

App.3d 525, 534-35, 690 N.E.2d 1320, 1326 (1997) (setting forth elements of state law

retaliation: (1) plaintiff must have been engaged in a protected activity, (2) plaintiff must have

been the subject of an adverse employment action, and (3) a causal link must have existed

between the protected activity and the adverse action).  *See also Pflanz v. Cincinnati*, 149 Ohio

App.3d 743, 764, 778 N.E.2d 1073, 1089 (2002) (recognizing the additional element that the

employer knows that the employee engaged in the protected activity).

Once a plaintiff meets this initial burden of establishing a *prima facie* case, the burden

shifts to the defendant to assert a legitimate, nondiscriminatory reason for its action.  *Morris*, 201

F.3d at 792-93.  *See also Wilson v. Stroh Cos.*, 952 F.2d 942, 945 (6th Cir. 1992) (citing

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)).  If the defendant provides a

legitimate, non-discriminatory reason for the discharge, the burden returns to the plaintiff to

show that the articulated reason was only a pretext for the adverse employment action.  *See*

*Morris*, 201 F.3d at 793 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256

(1981)); *Wilson*, 952 F.2d at 945 (citing *Burdine*, 450 U.S. at 256).

The Sixth Circuit Court of Appeals has explained the pretext inquiry:

> To raise a genuine issue of material fact on the validity of an employer's
> explanation for an adverse job action, the plaintiff must show, again by a

26

preponderance of the evidence, either (1) that the proffered reasons had no basis
in fact; (2) that the proffered reasons did not actually motivate the action; or (3)
that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (citing *Manzer v. Diamond

Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994)).  Notably, a plaintiff bears the

burden of rebutting a defendant's proffered reason for discharge with *specific* facts.  *See Celotex,*

477 U.S. at 324; Fed. R. Civ. P. 56(e).

Defendants correctly note that many of Gregg's allegations constitute acts performed

prior to his engaging in protected activity and therefore cannot constitute retaliation.  *See Nickel

v. Memphis Light, Gas & Water Div.*, 76 Fed. Appx. 87, 89, 2003 WL 22205073, at *1 n.2 (6th

Cir. Sept. 22, 2003); *Meadows v. Ford Motor Co.*, 21 Fed. Appx. 302, 304, 2001 WL 1299032,

at *2 (6th Cir. Aug. 9, 2001).   Further, Gregg has presented no facts directly suggesting that his

discharge was in retaliation for his December 2001 or January 2002 conduct.  Defendants argue

that Gregg cannot prove that a causal connection exists between this protected activity and the

alleged adverse employment actions following Gregg's engaging in protected activity.  The

Sixth Circuit Court of Appeals has explained that

[t]o demonstrate [the fourth prong] causal connection, a plaintiff is required to
proffer evidence sufficient to raise the inference that his or her protected activity
was a motivating factor for the adverse decision.  *See* [*Thaddeus-X v. Blatter,* 175
F.3d 378, 399 (6th Cir. 1999)].  Circumstantial evidence, like the timing of events
or the disparate treatment of similar individuals, may support this inference.

*Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002).  Gregg has failed to establish pretext.

This Court has previously noted SBC's explanation for refusing Gregg the promotion he

sought; Gregg was the least productive worker involved, which meant that he did not meet the

subjective criteria for the position.  The Court has also already discussed Gregg's termination

27

and the proffered cause for that action.  Although his discharge is certainly an adverse

employment action, Gregg has not established a casual connection between his activities and

either the discharge or the promotion refusal (or any other perceived slight he recounts).

Moreover, he cannot rest his pretext argument on the slight inference that he asserts exists in the

timing of his discharge, for example, because "[a]lthough adverse action taken shortly after an

exercise of a plaintiff's protected rights is relevant to the causation inquiry, temporal proximity

alone is generally insufficient to establish a causal connection for a retaliation claim."  *Cushman-*

*Lagerstrom v. Citizens Ins. Co. of America*, 72 Fed. Appx. 322, 332, 2003 WL 21774017, at *9

(6th Cir. July 30, 2003) (citations omitted).  *See also Coulter v. Deloitte Consulting, L.L.C.*, 79

Fed. Appx. 864, 867, 2003 WL 22514343, at *4 (6th Cir. Nov. 4, 2003).  In light of the meager

evidence presented, which this Court has considered both individually and collectively, the

Court notes that "the temporal proximity argument is particularly unconvincing where a

plaintiff's *prima facie* claim of retaliation is otherwise weak."  *Coulter*, 79 Fed. Appx. at 867,

2003 WL 22514343, at *4 n.5 (citing *Nguyen v. City of Cleveland,* 229 F.3d 559, 567 (6th Cir.

2000)).

       As with many of his claims, Gregg's allegations of retaliation lack evidentiary support.

Instead, he bases his claims on his own perceptions of what happened, assigning conspiratorial

and discriminatory motivations without apparent foundation.  Defendants are consequently

entitled to judgment as matter of law on Gregg's retaliation claims.

       **E.  Hybrid § 301 Claim**

       Section 301 of the Labor Management Relations Act provides:

       Suits for violation of contracts between an employer and a labor organization
       representing employees in an industry affecting commerce as defined in this

> chapter ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount of controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185.  This statute "governs claims founded directly on rights created by collective bargaining agreements, and also claims substantially dependent on analysis of a collective bargaining agreement."  *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1036 (6th Cir. 1989) (citing *Caterpillar Inc. v. Williams*, 182 U.S. 386 (1987)), *cert. denied* 495 U.S. 946 (1990).  *See also Aloisi v. Lockheed Martin Energy Systems*, 321 F.3d 551, 556 (6th Cir. 2003) (citing *Martin v. Lake County Sewer Co., Inc.*, 269 F.3d 673 (6th Cir. 2001); *Occidental Chem. Corp. v. Int'l Chem. Workers Union*, 853 F.2d 1310 (6th Cir. 1988); *LaBuhn v. Bulkmatic Transp. Co.*, 865 F.2d 119, 120 (7th Cir. 1988)).

The Sixth Circuit has explained that jurisdiction in a § 301 claim is premised upon the existence of a contract that an employer allegedly breaches.  *Bauer v. RBX Industries*, 368 F.3d 569, 578-79 (6th Cir. 2004).  That court has also noted that "[t]he general rule in LMRA actions is that an individual employee has no standing to file an action against her employer without also filing suit against her union for breach of the CBA."  *Id.* at 558 (citing *Bacashihua v. United States Postal Serv.*, 859 F.2d 402, 405-06 (6th Cir. 1988)).  An exception to this rule is when a plaintiff brings a hybrid § 301 claim, which the Sixth Circuit has explained as follows:

> "A hybrid section 301 action involves two constituent claims: breach of a collective bargaining agreement by the employer and breach of the duty of fair representation by the union."  *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573 583 (6th Cir. 1994) (citation omitted).  The two claims are "inextricably interdependent."  *DelCostello v. Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (internal quotation marks and citation omitted).  Unless a plaintiff "demonstrates both violations, he cannot succeed against either party."  *Bagsby v. Lewis Bros. Inc. of Tenn.*, 820 F.2d 799, 801 (6th Cir. 1987) (emphasis omitted).

*Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (footnote omitted).

Further, as the appellate court has noted, although a plaintiff need not sue both an employer and

the union, " 'the case he must prove is the same whether he sues one, the other, or both.' "

*Garrison*, 334 F.3d at 538 n.8 (quoting *DelCostello*, 462 U.S. at 165).   *See also Kassab v. Aetna*

*Indus., Inc.*, 54 Fed. Appx. 819, 825-26, 2002 WL 31870319, at *5 (6th Cir. Dec. 20, 2002); *Ely*

*v. Newell-Rubbermaid, Inc.*, 50 Fed. Appx. 681, 686, 2002 WL 31050986, at *3 (6th Cir. Sept.

12, 2002).

In light of the foregoing analytic framework–and despite the fact that he has not sued his

former union–Gregg must therefore prove both that SBC breached the collective bargaining

agreement and that the union breached its duty of fair representation.  *See Higgins v.*

*International Union, Security, Police, Fire Professionals of America (SPFPA)*, 398 F.3d 384,

387 (6th Cir. 2005) (quoting *Bagsby v. Lewis Bros., Inc. of Tenn.,* 820 F.2d 799, 801 (6th

Cir.1987)); *Alford v. General Motors Corp.*, 926 F.2d 528, 530-31 (6th Cir. 1991).  Both sides

move for summary judgment on this claim, but Defendants prevail on the grounds that Gregg can

prove neither violation.

The Court notes that, as with many of Gregg's filings, his motion for summary judgment

presents an often impenetrable text.  It is at times difficult to piece together what he is trying to

argue and what role Gregg intends each reference to the record or quotation to fulfill in that

argument.  As before, the Court has endeavored to interpret his document fully and fairly.

It appears that Gregg continues to believe that the advisory opinion functions as an

arbitration award subject to judicial enforcement.  This is simply incorrect.  As Defendants

correctly argue, the advisory opinion is an intermediate step between the filing of a grievance

and arbitration, but not an actual arbitration award.  Gregg's underlying premise in his summary judgment motion and much of the authority upon which he relies are therefore inapplicable here.

The Court also agrees with Defendants that, in regard to the alleged breach by SBC, SBC did not indicate acceptance of the advisory opinion to the union even under Gregg's version of the facts.  As SBC notes, the collective bargaining agreement contemplates communication between the company and the union.  The evidence indicates an accepted, timely oral rejection by SBC between these parties (Doc. # 254, Ex. A, Wells Aff. ¶ 4), and Gregg has not asserted facts indicating an applicable custom or practice that supports the contrary earlier "acceptance" he claims.

In regard to the alleged improper conduct of the union, Gregg has failed to produce evidence suggesting that the union acted in an arbitrary or discriminatory manner or with bad faith in declining both to file a breach-of-contract grievance and to pursue a discharge-related arbitration on his behalf.   Thus, even if the union ultimately misconstrued the collective bargaining agreement, no reasonable juror could conclude on these facts that fraud took place, that misrepresentation occurred, or that the union acted in a wholly irrational manner or in bad faith.  *See Garrison v. Cassens Transport Co.*, 334 F.3d 528, 538-39 (6th Cir. 2003); *Williams v. The Kroger Co.*, 369 F.2d 85, 86 (6th Cir. 1996).  Gregg's difference of opinion with the union does not present a viable breach-of-duty-of-fair-representation claim.  *See Moss v. International Association of Machinists & Aerospace Workers*, 996 F.2d 1216, WL 239057, at *6 (6th Cir. 1993) (unpublished table decision); *Smith v. Highland Park Federation of Teachers*, 833 F.2d 1013, 1987 WL 38242, at *3 (6th Cir. 1987) (unpublished table decision).

31

In considering the allegations forming the basis of Gregg's § 301 claim for a prior order, the Court expressed no opinion as to the ultimate merits of the claim.  In light of the facts as presented, which fail to present a genuine issue over whether SBC violated the collective bargaining agreement and over whether the union breached its duty of fair representation, the Court must conclude that no reasonable juror could determine that Gregg prevails on the fundamental elements of his § 301 claim.  *See Simoneau v. General Motors Corp.*, 85 Fed. Appx. 445, 2003 WL 23156653 (6th Cir. Dec. 19, 2003) (summary judgment on claim for breach of a collective bargaining agreement was proper where plaintiff failed to establish union's breach of duty of fair representation).  Gregg is therefore not entitled to judgment as a matter of law, while SBC prevails on its motion for summary judgment.

### F.  FLSA Claims

Gregg alleges that SBC denied him overtime pay in violation the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq*.  The FLSA provides

> No employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  Thus, with certain narrow exemptions that are inapplicable here, "[t]he FLSA requires employers to pay employees at a rate of 150% of their normal pay for work performed in excess of forty hours per week."  *Bowers v. NOL, LLC*,  114 Fed. Appx. 739, 740, 2004 WL 2671734, at *2 (6th Cir. Nov. 22, 2004).  *See also Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004).  To establish a *prima facie* case of a violation of this duty, a plaintiff must show that "(1) there exists an employer-employee relationship; (2) there was an engagement in activities within coverage of the FLSA; and (3) the defendant failed to pay

the plaintiff the overtime pay required by law." *Kowalski v. Kowalski Heat Treating, Co.*, 920 F. Supp. 799, 806 (N.D. Ohio1996).  *See also Herman v. Palo Group Foster Home, Inc.*, 976 F. Supp. 696, 700-01 (W.D. Mich. 1997).

Gregg asserts four potential violations of the FLSA.  Complicating the Court's task of addressing Gregg's FLSA claims is that Defendants continually reference at least one different date from Gregg, taking him to task over pay for October 20, *2002*–a date well after Gregg's February 28, 2002 discharge.  It appears to this Court that Defendants' confusion is an error on the part of their counsel that possibly arises from Hall's Affidavit.  In that affidavit, Hall states:

> I removed 6.5 hours of overtime pay from Mr. Gregg's pay for overtime he turned in for Saturday October 20, 2001, because on Friday October 19, 2002, I gave specific instructions that no member of my crew was to work overtime during the weekend.  I did not work on October 20, 2001 and did not know Mr. Gregg worked that day until after he turned in time records for that day.  See Exhibit B attached hereto showing my contemporaneous notes related to this.  I did not discipline Mr. Gregg for insubordination, although I considered his conduct to be insubordinate.

(Hall Aff. ¶ 14.)  Defense counsel may have been somehow misled by the apparent scrivener's error that identifies "Friday October 19" as 2002 and not 2001.  The Court notes that October 19, 2001 was a Friday and October 19, 2002 was a Saturday.  It would be nonsensical to construe Hall's affidavit as referencing instructions given in 2002 but targeting a 2001 weekend.  Further, the Exhibit B that Hall's Affidavit references is an SBC record pertaining to October 20, 2001 that includes handwritten notes by Hall stating, "We asked no Com-Techs to work this weekend, and Kevin was not asked to come in.  I advised Kevin that I would be taking away 6.5 hrs off of next check."  (Hall Aff., Ex. B.)  Thus, read in context, the Hall Affidavit and its supporting exhibit support SBC's contention that Gregg worked 6.5 hours of overtime on October 20, 2001 without permission.

Gregg maintains that although he performed several jobs for a total of 6.5 hours of work that day, SBC failed to pay him mandated overtime.  SBC in turn asserts that no technician on Gregg's crew was allowed to work overtime on that date and that, by doing so in violation of company policy and in contravention of an explicit directive from his supervisor, Gregg is not entitled to overtime pay.  To support this argument, SBC points to Hall's affidavit and its accompanying exhibit, which provide the bar on overtime that Gregg purportedly violated.  Gregg's conclusory attack on this explanation for denying overtime–that the records were altered–lacks evidentiary support.

This leaves Defendants' argument that the fact that other technicians were allegedly working that day and that *another* manager purportedly assigned Gregg work does not counter the order of Hall–*his* manager–that a group of technicians that included Gregg could not work overtime on the weekend in question.  In asserting that such a restrictive order precludes an FLSA violation here, Defendants rely upon *Lindow v. United States*, 738 F.2d 1057 (9th Cir. 1984).  In *Lindow*, the Ninth Circuit held that the employer-defendant did not "employ" the plaintiff for the claimed overtime within the meaning of 29 U.S.C. § 203(g) because the defendant had issued a letter stating that employees were not required to arrive early for their shifts and review log books.  *Id*. at 1060.  In reaching this conclusion, the *Lindow* court stated:

> We do not hold that an instruction standing alone conclusively establishes that an employer does not "suffer" or "permit" work to be done.  If the nature of the work required overtime or if the employer pressured the employees to work overtime, an instruction should not operate to defeat a claim for overtime compensation.  If, however, the employees could have performed the work during regular hours and the employer did not pressure the employees to work overtime, an instruction relieves the employer from liability for overtime compensation.

*Id*. at 1061 n.3.  Thus, *Lindow* turned in part on the fact that the employer was not requiring

employees to work *de minimis* minutes outside of their regular hours; rather, the employees were acting in their own interests.  As in *Lindow*, there is no evidence *sub judice* that the employer (SBC) pressured or encouraged the employee (Gregg) to report to work on October 20, 2001.  In fact, the evidence indicates that Hall forbid Gregg from working overtime that day.

Here the Court must note that the unsupported allegations contained within Gregg's memorandum in opposition could conceivably suggest a viable claim, undercutting Defendants' contention that "SBC did everything possible to prevent [Gregg's] crew from working overtime on October 20, [2001]."  (Doc. # 251, at 117.)  Gregg asserts that although SBC (through Hall) instructed Gregg not to work overtime, SBC (through manager Wakefield) permitted him to perform such work, assigning him multiple jobs.  If the evidence suggested these facts, Gregg would survive summary judgment, because permitting the company to evade liability for work given to Gregg would be to allow SBC to benefit from Gregg's labor and its own inconsistency.  The rationale for this point is that "employ" within the meaning of the FLSA includes "to suffer or permit to work."  29 U.S.C. § 203(g).  Gregg's allegations are that SBC suffered or permitted his October 20, 2001 work, despite the contrary October 19, 2001 instruction, by permitting him to work.

But the critical flaw in this theory–a theory Gregg does not even advance–is that *Gregg has not directed this Court to any summary judgment evidence supporting this factual scenario*.  He does not cite a supporting affidavit, deposition testimony, or documentation supporting the factual allegations contained in his briefing concerning Wakefield, but instead only directs this Court to various records.  These records indicate that Gregg worked on the date in question and that SBC denied him overtime pay, but the documents do not indicate how he obtained the jobs

her performed, who assigned him these jobs, and whether any manager actually knew he was working that day.  It is well settled that a plaintiff cannot evade summary judgment by making bare allegations, but must instead produce evidence.  *Hamilton v. Roberts*, 165 F.3d 27, 1998 WL 639158, at *5 (6th Cir. 1998).  It is also clear, as Defendants note in their reply memorandum (Doc. # 269, at 5-6), that this Court need not scour the record to uncover any evidence that a *pro se* plaintiff such as Gregg could have brought to the Court's attention.  *See InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").  Although this Court appreciates specificity by the parties in pointing to summary judgment evidence, it does not require undue precision in identifying relevant parts of the record.  But Gregg has failed to identify even roughly any evidence in his three volumes of exhibits, his deposition, or elsewhere in the record supporting his key allegations.  Accordingly, Gregg's unsupported factual contentions cannot serve as specific facts that enable him to evade summary judgment on this specific FLSA claim.

The second date involved in Gregg's FLSA claims is January 11, 2002.  It is uncontested that Defendants ultimately paid Gregg .5 hour overtime compensation in connection with that date.  (Keenan Aff. ¶ 32; Gregg Dep. at 544-47.)  The issue is therefore whether Gregg has a FLSA claim predicated upon the initial refusal of overtime compensation.  Defendants assert that a plaintiff cannot maintain a claim under the FLSA when he has ultimately received the compensation at issue.  Gregg does not address this argument in his memorandum in opposition, and this Court concludes that he cannot recover as a matter of law overtime pay that he has

already fully received.

The Court notes, however, that there could be an issue of liquidated damages in connection with this FLSA claim.  Because Gregg's pleading is hardly a model of clarity, the Court shall give him the benefit of the doubt and assume that he intended to pursue all available relief, which would arguably include liquidated damages.  29 U.S.C. §§ 216(b), 260.  Assuming without deciding that a plaintiff can even pursue such relief for an initial but remedied FLSA violation, there is no evidence here that could enable a reasonable factfinder to conclude that Keenan's conduct (and hence SBC's conduct) that resulted in the initial underpayment of wages was a willful violation of evinced bad faith, malice, or oppression.  Rather, the evidence presented indicates Keenan's good faith.  Accordingly, Gregg cannot obtain liquidated damages, which means that he has no viable claim in connection with the January 11, 2002 incident.

Finally, Gregg raises in his memorandum in opposition two more dates for which he allegedly did not receive overtime compensation–March 24, 2001 and an unidentified day in May 2001.  (Docs. # 260 & 267, at 36.)  Gregg states that "[a]ll though [*sic*] I do not recall the exact circumstance I do recall that I again had did and completed work for SBC by which they made money.  I was not credited for my time and money was taking [*sic*] away from me."  (Docs. # 260 & 267, at 36.)  Gregg then proceeds to state that his checks were altered to delete the time worked and that he "[has] not been able to confirm spoliation as yet, but believe such to be apparent."  (Docs. # 260 & 267, at 36.)  In attempting to construe his argument, the Court thinks that Gregg is alleging that it "appears" he worked one date during each of the two months in question, that he did not receive overtime pay for the work, and that SBC has altered its records in an effort to conceal the claimed FLSA violations.  But as with all of Gregg's

accusations of records tampering, he offers no evidence to support his theory; Gregg's

allegations are simply wholly conclusory.  Further, he has failed to offer evidence supporting the

claimed FLSA violations during these months, states that he cannot recall the circumstances

behind the violations, and cannot even identify the day involved in one of the alleged violations.

Even construing his claim charitably to permit consideration of such added days, the Court must

agree with Defendants that they are also entitled to judgment as a matter of law on Gregg's

claims related to these additional days.

### G.  Intentional Infliction of Emotional Distress Claim

Gregg also asserts a state law claim for the intentional infliction of emotional distress.

Under Ohio law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly

causes serious emotional distress to another is subject to liability for such emotional distress."

*Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of America*,  6

Ohio St. 3d 369, 453 N.E.2d 666, syllabus (1983).  The Sixth Circuit has explained the tort:

> In order to prevail on a claim for intentional infliction of emotional
> distress, a plaintiff in Ohio must establish: "1) that the actor either intended to
> cause emotional distress or knew or should have known that actions taken would
> result in serious emotional distress to the plaintiff, 2) that the actor's conduct was
> so extreme and outrageous as to go 'beyond all possible bounds of decency' and
> was such that it can be considered as 'utterly intolerable in a civilized
> community,' 3) that the actor's actions were the proximate cause of plaintiff's
> psychic injury, and 4) that the mental anguish suffered by plaintiff is serious and
> of a nature that 'no reasonable man could be expected to endure it.' "

*Williams v. York Int'l Corp.*, 63 Fed. Appx. 808, 813, 2003 WL 1819637, at *4 (6th Cir. Apr. 3,

2003) (quoting *Pyle v. Pyle*, 11 Ohio App. 3d 31, 463 N.E.2d 98, 103 (1983) (internal citations

omitted in *Williams*)).  The standard in Ohio imposes liability only where " 'the recitation of the

facts to an average member of the community would arouse his resentment against the actor, and

lead him to exclaim, "Outrageous!" ' " *Torres v. White*, 46 Fed. Appx. 738, 755, 2002 WL 2027244, at *15 (6th Cir. Aug. 22, 2002) (quoting *Yeager*, 6 Ohio St. 3d at 375, 453 N.E.2d at 671 (citation to Restatement (Second) of the Law, Torts 71, § 46(1) cmt. d (1965) eliminated)). The standard has also been described as requiring facts indicating conduct that a reasonable person could conclude is "beyond all possible bounds of decency." *Cf. Liadis v. Sears, Roebuck and Co.*, 47 Fed. Appx. 295, 299, 2002 WL 31085158, at *3 (6th Cir. Sept. 17, 2002) (declining to impose liability for intentional infliction of emotional distress when facts do not rise to quoted standard) (quoting *Yeager,* 6 Ohio St. 3d at 374-75, 453 N.E.2d at 671)); *Torres*, 46 Fed. Appx. at 756-57, 2002 WL 2027244, at *16-17 (same).

Defendants move for summary judgment on the grounds that Gregg is unable to produce any evidence that, even accepting his allegations as true, meet the elements of the tort. Even setting aside issues of intent, the Court agrees that nothing alleged here rises to the requisite level of offensive misconduct so as to fall within the intentional tort. The evidence before this Court does not even suggest by inference conduct so extreme and outrageous as to go beyond all possible bounds of decency so that it is outrageous and utterly intolerable in a civilized community. No reasonable juror could conclude otherwise.

Further, Gregg has failed to produce any evidence to substantiate that he has suffered serious emotional distress of the sort actionable under this tort. Even crediting his litany of alleged complaints, including sleeplessness and anxiety, summary judgment is warranted because Gregg's purported symptoms do not rise to the level of severe and debilitating distress. *See Chance v. Mahoning County*, 105 Fed. App. 644, 649, 2004 WL 1491622, at *5 (6th Cir. 2004) (recognizing that Ohio requires severe and debilitating emotional injury to recover on

intentional infliction of emotional distress claim); *Torres*, 46 Fed. Appx. at 756-57, 2002 WL 2027244, at *16-17 (same).

Defendants are therefore entitled to judgment as a matter of law on Gregg's intentional infliction of emotional distress claim.

## V.  Conclusion

For the foregoing reasons, the Court **DENIES** Gregg's motion to strike (Doc. # 260 (original), 267 (corrected version)), **DENIES** Gregg's motion for summary judgment (Doc. # 249), **DENIES** as moot Defendants' motion to strike (Doc. # 269), and **GRANTS** Defendants' motion for summary judgment (Doc. # 251).  The Clerk is instructed to enter judgment accordingly and terminate these consolidated cases upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

  /s/  Gregory L. Frost          
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE
